**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>Joan Marie Tinsley,<br><br>Ms. Tinsley. | Case No.: 17-28611-ABA<br><br>Chapter: 7 |
| Joan Marie Tinsley,<br>Plaintiff,<br>v.<br>U.S. Department of Education,<br>Defendant. | Adv. No.: 17-1622-ABA<br><br>Judge: Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

The plaintiff, Joan Marie Tinsley ("Ms. Tinsley"), commenced this adversary proceeding against the U.S. Department of Education ("DOE") seeking to discharge her student loan debt under section 523(a)(8) of the Bankruptcy Code. After a full trial, and considering the submissions of the parties and evidence presented, the court finds Ms. Tinsley has not met her burden that she is entitled to an undue hardship discharge of her student loan debt *at this time*. However, should the circumstances change such that repayment of the debt constitutes an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8), Ms. Tinsley is free to seek to reopen her case to seek further relief.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

Ms. Tinsley filed a voluntary petition under chapter 7 on September 13, 2017. On September 20, 2017, Ms. Tinsley filed an adversary complaint against DOE asserting that she was entitled to discharge her student loan debt due to undue hardship. She filed an amended complaint on January 9, 2018, and DOE filed an answer to that amended complaint on February 13, 2018. A trial in this matter was held on October 3, 2018, and at the conclusion thereof the court permitted the parties to submit post-trial briefs and took the matter under advisement. The post-trial briefs have been submitted and the matter is now ripe for consideration.

## FINDINGS OF FACT

Between January 2011 and March 2014, Ms. Tinsley obtained loans from DOE through its Federal Direct Loan Program to fund her education at the Harris Business School and Atlantic County Community College. Ms. Tinsley studied to be a medical assistant and received her certificate, though she did not take the tests required to work in the field. (Doc. No. 34, Transcript of Trial Proceedings ("Tr.") 84:2-12). The amount borrowed was $31,743.01.[1]

**The Repayment Program**

On May 6, 2015, shortly after Ms. Tinsley's loans went into repayment, she applied to DOE to participate in an income-based repayment plan. DOE enrolled her in the income-based repayment plan—the Pay as You Earn Plan ("PAYE") created by 34 C.F.R. § 685.209(a). Loans in the Federal Direct Loan Program are eligible for participation in PAYE, and borrowers with financial hardship may apply to participate in the program. 34 C.F.R. § 685.209(a)(1)(ii), (a)(2)(i). Under PAYE, a borrower's aggregate monthly loan payment is limited to ten percent of the amount by which the borrower's adjusted gross income exceeds 150% of the federal poverty guideline applicable to the borrower's family size, divided by 12. 34 C.F.R. § 685.209(a)(2)(i). DOE determines family size by identifying the borrower's spouse and dependents and uses the borrower's adjusted gross income reported to the Internal Revenue Service. 34 C.F.R. § 685.209(a)(1)(i) and (iv). The Department of Health and Human Services publishes the yearly poverty guideline applicable to DOE's calculation. 34 C.F.R. § 685.209(a)(1)(vi). If the borrower participates in PAYE for 20 years, the entire loan balance, including accrued interest, is forgiven and DOE cancels the debt. 34 C.F.R. § 685.209(a)(6).[2]

The PAYE program requires an annual enrollment and review of Ms. Tinsley's income to determine what, if any, monthly payment is required based upon her earnings. On her initial application, Ms. Tinsley reported an income of $14,367 and requested a repayment plan "with the lowest monthly payment." Tr. 50:20–51:3. Ms. Tinsley's initial monthly payment was $0. Tr. 51:4-7. The following year, on June 9, 2016, Ms. Tinsley reported an income of $23,731 and again

---

[1] When Ms. Tinsley filed her chapter 7 bankruptcy case, her total debt for the student loans was $33,969.10.

[2] A consequence of this debt cancellation may be a tax liability. However, based on Ms. Tinsley's future ability to pay down the debt and the eighteen years until this cancellation might occur, the court finds the issue speculative and not appropriate for it to try to predict what consequences, if any, may occur in eighteen years.

requested a plan with the "lowest monthly payment." Tr. 52:5–18. DOE again placed her on a $0 per month repayment plan. Tr. 52:19–21. The next year, Ms. Tinsley reported that her income had again increased substantially, to $36,622. Tr. 53:10–16. As a result, her payment amount under PAYE increased to $49.93 as of August 2017. Tr. 54:18–24. Consistent therewith, Ms. Tinsley made a payment of $49.93 under the program in August 2017. The next month, she filed this Chapter 7 bankruptcy case. Tr. 55:12–17. At that time, Ms. Tinsley had made twenty-five qualifying payments, twenty-four of which were monthly payment amounts of $0. Tr. 7:17–25, 56:2–10. When she filed her Chapter 7 petition, Ms. Tinsley's loans went into forbearance and she has not made a payment to DOE since that time. If Ms. Tinsley enrolled again in the program, because she made twenty-five qualifying payments, her remaining repayment period would be just under eighteen years. Tr. 55:21–56:10.

### Personal Information

Ms. Tinsley is a 49-year-old mother of two children. Tr. 17:17–25. For the past six years, she has lived in an apartment in Atlantic City with her two children. Tr. 50:8–9. Her son is sixteen years old and in eleventh grade. Tr. 17:21–23, 72:18–19. Her daughter, who is now away at college, is eighteen. Tr. 12:13–14, 17:21–23; 72:11–14. The evidence presented showed that there are no other financial dependents. Ms. Tinsley hopes that her daughter, who is a freshman, will graduate college within four years, and she anticipates that her son will graduate college four years after he graduates from high school. Tr. 72:16-24. Thus, it is possible that in six years Ms. Tinsley will have no dependents. Tr. 72:25–73:2. Ms. Tinsley also stated at trial that she will "[s]oon be retirement age and [her] income will lessen, so [her] situation financially won't get better, it will get lessen [sic] or worse, especially with [her] raising two children." Tr. at 12:10–13.

### Work Opportunities/Wages

Ms. Tinsley graduated from Harris Business School with a certificate to be a medical assistant, but was not able to afford the tests required after graduation to obtain a job. Tr. 84:2–18. When Ms. Tinsley began school, she believed the certificate was enough to obtain employment and did not realize that she would have to spend more money for a test after graduation. Tr. 84:11–18. Ms. Tinsley testified that if she were to pass the test she could work at any doctor's office, hospital, or become a travelling nurse, thereby eventually earning more money. Tr. 85:9–15, 86:23–87:8. However, because she received her certificate approximately seven years ago, Ms. Tinsley would now need to update her certification before beginning work in the medical field but would likely not need to return to school. Tr. 90:8-16.

At the time of the trial,[3] Ms. Tinsley was working at Comcast making $13.85 an hour working almost a full-time schedule of 38 hours a week, and she testified that her net income (after expenses) was $2,218 a month.[4] Tr. 31:23–32:12, 43:18–19. She receives yearly pay increases based on performance. Tr. 87:11.

---

[3] At the time of the filing of her bankruptcy petition, Ms. Tinsley was working at The Tropicana Casino & Resort in Atlantic City, but since had to resign due to medical reasons.

[4] Based on the number of hours and the hourly rate, the numbers do not add up, and unfortunately, Ms. Tinsley did not provide sufficient evidence to show the court what her actual current monthly income is. The court attempted to clarify her net monthly income through oral testimony but was unable to do so. Tr. 31:23–32:12, 38:5–8, 78:9–11. In

**Medical Condition**

Ms. Tinsley submitted medical documents at trial to show that she had three medical conditions that, when they arose, made her eligible for intermittent leave from work. Tr. 18:14–21:4. First, Ms. Tinsley testified that she suffered from asthma. Tr. 18:14–25. However, when asked if her at-home asthma treatments required her to miss work she explained that it used to cause her to miss work at Tropicana but had not required her to miss work at Comcast. Tr. 43:2–24.

The second medical condition Ms. Tinsley testified to was her iron deficiency which, when the level gets too low, makes her very weak and fatigued and in turn causes her to be unable to "function in a normal situation." Tr. 19:1–20:12. This occurs about four times a year and is treated by iron infusions at the doctor's office, which causes Ms. Tinsley to miss work. Tr. 20:1–12. Ms. Tinsley was asked if the iron deficiency had caused her to miss work since starting at Comcast in January of 2018. Tr. 45:12–13. She answered that she has had two treatments since starting at Comcast and each treatment causes her to miss about five to six hours of work, but then she stated that she had missed fifteen hours of work due to iron deficiency since starting work at Comcast. Tr. 46:8–24. When she has to miss work, Ms. Tinsley explained that her employer usually revises her schedule to accommodate her treatments, but sometimes, she still has to miss some work. Tr. 46:8–11. Ms. Tinsley does not get paid for the hours she misses. Tr. 82:15–17.

The final medical condition Ms. Tinsley testified about was that, due to an infected mesh, she has constant hernias and abscesses that have required her to have surgery. Tr. 20:13–21:4. However, when it was pointed out that her exhibit noted that the doctor estimated that the period for incapacity for this condition ended December 7, 2017, Ms. Tinsley admitted that it has not arisen since 2017 and she is no longer dealing with that condition. Tr. 47:9–20.

In the end, when pressed, Ms. Tinsley testified that though her medical issues left her unable to continue at Tropicana, she was clear that she is able to now work full-time at Comcast in spite of those issues. Tr. 43:20-24.

**Income and Expenses**

Ms. Tinsley set forth her finances as follows:

| Source | Income | Transcript Citation |
|---|---|---|
| Net Income[5] | $2,218 | Tr. 78:9–11 |
| Rental Assistance | 357 | Tr. 40:10–11 |
| Food Stamps | 403 | Tr. 78:15–16; Exhibit D-e |

---

addition, Ms. Tinsley only brought a copy of her paystub from Tropicana—not from Comcast, her current employer—and she admitted that the wages form Tropicana were no longer relevant as she had stopped working there. Tr. 22:15–23:5.

[5] At trial, Ms. Tinsley testified that her net income after taxes, medical, and normal deductions was $2,218. Tr. 31:23–35:22.

| Source | Income | Transcript Citation |
|---|---:|---|
| *Child Support*[6] | 385 | *Tr. 78:17–79:1* |
| Sum | $3,368 (2,983 without child support) | |

| Source | Expenses | Transcript Citation |
|---|---:|---|
| Rent | $1,229 | Tr. 26:25–27:2; Exhibit D-d |
| Car Payment | 623 | Tr. 37:15–17; Exhibit DOE 8 |
| Phone Bill | 160 | Tr. 79:15 |
| Cable | 46 | Tr. 79:16 |
| Utilities[7] | 235 | Schedule J[8] |
| Snacks and Kids' Emergency Supplies | 125 | Schedule J |
| Food and Housekeeping Supplies | 400 | Schedule J |
| Clothing, Laundry, Dry Cleaning | 250 | Schedule J |
| Personal Care Products and Services | 75 | Schedule J |
| Transportation | 75 | Schedule J |
| Entertainment, Clubs, recreation, Newspapers, magazines, and Books | 150 | Schedule J |
| Life Insurance | 60 | Schedule J |
| Sum | $3,428 | |

*Notably, these expenses do not contain a line item for repayment of the student loans.*

### Explanation of Undue Hardship

Based upon her current income and expenses, Ms. Tinsley is currently eligible for a zero-dollar a month repayment plan. Tr. 61:1-7. Nevertheless, Ms. Tinsley emphasized that her undue hardship arises not from the proposed monthly dollar amount of the repayment plan but rather "the stigma of the student loan on [her] credit." Tr. 61:8-17. She then identified aspects of her life that she contends her poor credit has affected. First, she testified to a general desire to relocate to a safer neighborhood. Tr. 61:18, 63:24-25, 64:23-25. When asked who the stigma was with in this regard Ms. Tinsley responded "creditors, any renters, any real estate." Tr. 66:22–63:1. However,

---

[6] Ms. Tinsley testified that she has been unable to collect child support because the state is unable to locate the non-custodial parent's employer, but admitted that she is entitled to it. Tr. 78:23.

[7] Utilities include electricity, heat, natural gas, water, sewer, and/or garbage collection. Schedule J.

[8] The court asked Ms. Tinsley if, besides the expenses she mentioned, any other expenses were different from when she filed bankruptcy. Tr. 79:19–20. Ms. Tinsley responded that they were not, thus, the court is supplementing the record using Ms. Tinsley's Schedule J to fill in expenses that were not discussed at trial.

Ms. Tinsley produced no evidence that her outstanding student loans prevented her from relocating to a safer neighborhood.[9]

Next, Ms. Tinsley testified that her low credit score is a result of her student loan debt and that has prevented her from taking out additional student loans on behalf of her children, such as the Parent Plus loan. Tr. 62:25–63:8, 63:11–12, 64:9–12, 65:11–14. However, she admitted that she had no evidence either to support that her low credit score is a result of her student loan debt, or that it has prevented her from taking out additional student loans. Tr. 65:25-66:3, 66:4-9. In fact, she flat out refused to divulge any information to support this theory. Tr. 65:24. She also testified that she did not know what her credit score was before she took out the loans at issue, or what her credit score is now. Tr. 66:10-14. Ms. Tinsley conceded that her two prior bankruptcy filings—along with her current bankruptcy filing—may have affected her credit score. Tr. 61:21-62:6.

Ms. Tinsley also suggested that employers now verify your credit report and deny you from certain positions if you owe certain loans. Tr. 64:3–4. But again, she produced nothing to support her position that any prospective employers had denied her a position as suggested.

Finally, in her post-trial brief, Ms. Tinsley contended that making loan payments "on an ongoing basis means [she] [is] unable to pay the basic necessities in the household, water, gas, electric, rent." (Doc. No. 36). This contention was not raised at trial and not supported by the evidence Ms. Tinsley submitted.

**Vehicle Purchase**

On March 10, 2018, while this adversary was pending, Ms. Tinsley purchased a brand new 2018 Dodge Journey. In connection therewith, she obtained a new car loan in the amount of $30,931.62. Tr. 66:15–24. This resulted in a monthly car payment of $623.01 for the next six years. Exhibit DOE 8. According to the IRS, the Local Transportation Expense Standards for this Region for a car payment is $497 a month.[10] Ms. Tinsley testified that there were other cars available with a cheaper monthly payment, but she decided to go with that car based upon incentives offered. Tr. 68:4–6, 67:19–24.

**Parties' Positions**

DOE asks that Ms. Tinsley enroll in a $0 per month repayment plan.[11] This repayment amount would account for her current financial circumstances but leave open the possibility that she may contribute more to her taxpayer-funded debt when her circumstances change, such as

---

[9] In taking judicial notice of its own docket, the court notes that Ms. Tinsley has recently filed a *Change of Address* reflecting her relocation to a new address despite the outstanding student loan debt. *See generally In re Indian Palms Associates, Ltd.*, 61 F.3d 197 (3d Cir. 1995), *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 884 (Bankr. E.D. Pa. 2007).

[10] *See* www.justice.gov/ust/eo/bapcpa/20181101/bci_data/IRS_Trans_Exp_Stds_NE.htm

[11] DOE has reiterated that Ms. Tinsley may re-enroll in her current PAYE program, i.e., the one where her remaining repayment period would be just under eighteen years because she made twenty-five qualifying payments. Of course, adjustments may have to be made in light of the forbearance period.

when her children—currently ages sixteen and eighteen—no longer depend on her for financial support. Ms. Tinsley refuses to accept the proposed repayment plan. Instead, she asks this Court to discharge her student loan debt in its entirety.

## DISCUSSION

Section 523 provides:

(a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(8)  unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

11 U.S.C. § 523(a)(8). There is no dispute that the loans Ms. Tinsley received through DOE's Federal Direct Loan Program to fund her education qualify under this statute. The challenge is whether the repayment of the loans would impose an undue hardship on Ms. Tinsley.

The Third Circuit has adopted the Second Circuit's *Brunner* test to determine the existence of an "undue hardship" under section 523(a)(8). *Pennsylvania Higher Educ. Assistance Agency v. Faish*, 72 F.3d 298, 300 (3d Cir. 1995). *See Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). The *Brunner* test sets forth a three-part test for undue hardship whereby the debtor must demonstrate:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The debtor bears the burden of establishing each element of the *Brunner* test by a preponderance of the evidence. *In re Brightful*, 267 F.3d 324, 327 (3d Cir. 2001). "All three elements must be satisfied individually before a discharge can be granted[] [and] [i]f one of the requirements of the *Brunner* test is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Faish*, 72 F.3d at 306; *In re Davis*, 526 B.R. 136, 141 (Bankr. W.D. Pa. 2015) ("If one of the three elements of the test is not met, because the test is

written in the conjunctive, the Court's inquiry ends there, and the student loan debt is not dischargeable."). "Equitable concerns or other extraneous factors not contemplated by the *Brunner* framework may" not be used to support a finding of dischargeability. *Faish*, 72 F.3d at 306. The *Brunner* test "safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices." *Id.*

### A. Prong 1: Minimal Standard of Living

The first prong of the *Brunner* test requires the debtor to show that "the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. This requires "an examination of the debtor's current financial condition to see if payment of the loans would cause [her] standard of living to fall below that minimally necessary." *Faish*, 72 F.3d at 305 (citing *In re Robinson*, 999 F.2d 1132, 1135 (7th Cir. 1993)). A debtor is not expected to live in "abject poverty" in order to repay a student loan. *Id.* at 305. However, "more than a showing of tight finances" is required. *Id.* at 306.

As set forth above, Ms. Tinsley testified to income, governmental assistance, and various expenses that led her total income to be $3,368 (or $2,983 if one discounts the $385 Ms. Tinsley says she is not receiving as support) and her total expenses to be $3,428. DOE argues that Ms. Tinsley orally testified that her expenses are only $2,052 a month, and thus she has a surplus of more than $1,000 a month. Doc. No. 37, p.16. However, that calculation fails to take into account the expenses disclosed on Ms. Tinsley's Schedule J, which in direct response to the court's questioning, Ms. Tinsley stated remained the same. Based upon the evidence presented, the court believes that Ms. Tinsley has satisfied by a preponderance of the evidence that her current monthly expenses exceed her current monthly income.

The question becomes whether Ms. Tinsley's repayment of the loans would cause her *current* standard of living to fall below that which is minimally necessary. DOE argues that a $0 payment cannot impact her current standard of living and in fact, Ms. Tinsley conceded that the proposed monthly payment amount of $0 was manageable. As set forth below, this misses the point. Still DOE argues that when determining whether debtors can maintain a minimal standard of living while making student loan payments "courts do not consider the total debt amount but the actual amount due to [DOE] under the applicable repayment plan." Doc. No. 37, p.15 (citing *Goforth v. U.S. Dept. of Education*, 466 B.R. 328, 337 (Bankr. W.D. Pa. 2012)). And as such, "it is more difficult to establish that, based on current income and expenses, the proposed monthly loan payment will leave the debtor unable to maintain a minimal standard of living when [DOE] has offered a $0 monthly payment amount."[12] Doc. No. 37, p.16 (citing *Greene v. U.S. Dep't of Educ.*, No. 4:13-cv-79, 2013 WL 5503086, at *5 (E.D. Va. Oct. 2, 2013)).

The Third Circuit has not examined how a zero-dollar-per-month plan impacts the first prong of the *Brunner* test or a debtor's burden of showing that he or she cannot maintain a minimal

---

[12] DOE clarified that its position is not that the availability of a zero-dollar-per-month plan automatically prevents Ms. Tinsley from meeting her burden under the first prong, but that coupled with Ms. Tinsley's admission that the amount is manageable, prevents her from meeting the burden. Doc. No. 37, p.15 n.6.

standard of living while making a loan payment of $0 a month. However, courts within the Third Circuit have touched on the issue. For example, the bankruptcy court for the Western District of Pennsylvania aptly wrote a detailed analysis explaining why "those debtors whose incomes are low enough to qualify for income-based repayments of $0.00 likely are the very individuals the undue hardship exception for student loans is meant to assist." *In re Reagan*, 587 B.R. 296, 301 (Bankr. W.D. Pa. 2018) (citing *In re Nightingale*, 529 B.R. 641, 650 (Bankr. M.D.N.C. 2015)). "If a debtor establishes that she cannot maintain a minimal standard of living at any payment amount, the first prong of the Brunner test is satisfied." *Id.* This court agrees and is further persuaded by the reasoning of the bankruptcy court in *In re Crawley*, 460 B.R. 421, 438 (Bankr. E.D. Pa. 2011), where, as in this case, without taking into account loan repayment costs, a debtor is living below a minimal standard of living:

> Regardless whether the Debtor participates in the ICRP, the fact remains that the Debtor cannot maintain a minimal standard of living if required to repay the loan at any payment level. This reality renders the ICRP irrelevant under the first prong, even when the payment level would be zero ($0.00). To hold otherwise would make eligibility in the ICRP outcome determinative in undue hardship determinations under § 523(a)(8) and would result in the delegation to an administrative agency, the Department of Education, the authority to determine the dischargeability of certain student loans. I agree with those courts and commentators who perceive such a result as depriving the bankruptcy court of its proper role—and the role intended by Congress—in dischargeability determinations.

*Id.* at 438. Thus, the court finds that whether or not a debtor is eligible for a zero-dollar-per-month repayment plan is not outcome determinative as to the first prong of the *Brunner* test. If the court finds that a debtor has reasonable expenses that significantly exceed their income and they would be unable to pay any loan amount, then the first prong is satisfied, even if a zero-dollar-per-month repayment plan is an option.

Here, the court disagrees with DOE's position that there was not sufficient evidence to support Ms. Tinsley's income and expenses. The court directly examined Ms. Tinsley concerning her testimony and bankruptcy schedules. There were no significant challenges to her testimony. The court found Ms. Tinsley generally credible in her testimony. As the trier of fact, the court may rely on her testimony as evidence and draw reasonable conclusions therefrom. *In re Brightful*, 267 F.3d 324, 330 (3d Cir. 2001); *In re Lynn*, No. BAP ID-13-1218, 2013 WL 6234511, at *4 (B.A.P. 9th Cir. Dec. 2, 2013); *Crawley*, 460 B.R. at 442. The court believes her testimony that she is currently not receiving the $385 a month in child support. In addition, in the court's experience, Ms. Tinsley's expenses are reasonable and, in some cases, may be understated (for example, her monthly transportation operating expense of $75 is well below the national standard of $252[13]). While at first glance, entering into a contract for a brand-new vehicle at a high monthly payment seems to test the limits of reasonableness, in reality, the amount in question is insignificantly above the national standard for this region. As to the few excessive expenditures on gifts and other products, these were isolated incidents and Ms. Tinsley convincingly explained the purposes

---

[13] See Footnote 10.

therefore.[14] Ms. Tinsley has established that *currently*, she cannot maintain a minimal standard of living at any payment amount and simple belt-tightening would not change this. Thus, the first prong of the *Brunner* test is satisfied.

### B. Prong 2: Additional Circumstances Indicate the Debtor's State of Affairs will Continue for a Significant Portion of the Repayment Period

The second prong of the *Brunner* test requires the debtor to show that "[a]dditional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. It is not enough for her to show that she is currently in financial distress, but rather she must show "a total incapacity... in the future to pay [her] debts for reasons not within [her] control." *In re Brightful*, 267 F.3d 324, 328 (3d Cir. 2001) (quoting *Faish*, 72 F.3d at 307). "This is a demanding requirement." *Brightful*, 267 F.3d at 328. "In other words, 'dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment.'" *Id.* (quoting *In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985)). "These [additional] circumstances need to be detailed and not based on assumptions." *In re Williams*, 296 B.R. 128, 134 (Bankr. D.N.J. 2003); *see also Brightful*, 267 F.3d 324 at 330 (holding that the bankruptcy court could not assume that because the debtor had psychological and emotional problems she would be prevented from being gainfully employed, because no evidence was presented that showed the debtor's conditions would impair her ability to work).

The remaining period for the student loans in this case is eighteen years. For several reasons, Ms. Tinsley cannot satisfy the second prong of the *Brunner* test.

#### 1. Ms. Tinsley's medical condition does not prevent her from maintaining full-time employment for a significant portion of the repayment period of the student loans.

Ms. Tinsley presented evidence that she suffers from three medical conditions that will prevent her from fulfilling her financial commitment in the future. Though medical illnesses are a frequent reason that courts in this district have found that "additional circumstances" exist under the second prong of the *Brunner* test that would cause the debtor's state of affairs to persist for a significant portion of the repayment period, the medical condition usually inhibits the debtor's ability to obtain gainful employment. *See In re Jara*, No. 04-47384 RTL, 2006 WL 2806556, at *5 (Bankr. D.N.J. Sept. 27, 2006) (granting student discharge where the debtor had "a chronic, incurable mental health condition (bipolar disorder) that [would] persist" and sporadic employment was the best she could accomplish for the foreseeable future); *In re Williams*, 296 B.R. 128, 134–135 (Bankr. D.N.J. 2003) (granting student discharge where the debtor was "doomed to a life of catheterization, bladder infections, kidney damage, daily medication and frequent hospitalizations," had been diagnosed as permanently and totally disabled, and accepting employment would have been against her doctor's advice); *In re Rivera*, 284 B.R. 88, 91–92 (Bankr. D.N.J. 2002) (granting student discharge where the debtor's chronic asthma, memory loss, panic attacks, depression and multiple personality disorder were permanent disabilities and the

---

[14] One might even argue that those expenses were accounted for by averaging out Ms. Tinsley's personal expenses for entertainment, personal care, and clothing.

debtor had been advised not to work by his doctor); *cf. In re Vasilyeva*, No. 07-22164 (KCF), 2008 WL 5954678, at *3 (Bankr. D.N.J. Dec. 12, 2008), *aff'd sub nom. Vasilyeva v. Educ. Res. Inst., Inc.*, No. CIV.A. 09-709FLW, 2009 WL 3415283, *2–3 (D.N.J. Oct. 22, 2009) (the court acknowledged that the debtor had "not had good fortune in the job market to date," but did not find any reason "outside [the debtor's] control that would preclude her from improving her financial condition" reasoning that even if she had documented the existence of her medical conditions, she did not prove that she had any condition that "would preclude her from performing her current job responsibilities" and, thus, did not grant a discharge of the student loans); *In re Steers*, No. ADV. 07-1902, 2008 WL 2038835, at *4 (Bankr. D.N.J. May 12, 2008) (denying discharge for a debtor that struggled with serious psychological problems and testified to suffering from spinal cervical stenosis—which causes pain and hinders her ability to stand or sit in certain positions—but did not present evidence that the injuries would continue for a significant portion of the repayment period or that they could never be managed enough to the point where she could become employed).

Ms. Tinsley presented evidence that she suffers from three medical conditions, but during cross-examination, admitted that only one of her conditions, her iron deficiency, continued to cause her to miss work at her current job. Ms. Tinsley further admitted that she only missed an insignificant amount of time at work as a result of the condition and even then, her employer is kind enough to revise her schedule to make up for some of the time missed. Thus, similar to the debtor in *Brightful,* Ms. Tinsley presented no evidence that going forward she would be prevented from being gainfully employed for a significant portion of the repayment period of the student loans because of her medical conditions.

### 2. Ms. Tinsley's expenses will decrease dramatically for a significant portion of the repayment period of the student loans.

The evidence at trial reflects that Ms. Tinsley's children are currently sixteen and eighteen years old, and Ms. Tinsley hopes both her children will graduate college, and, thus, in six years she may no longer have dependents impacting her income. Additionally, Ms. Tinsley is currently paying over $600 per month towards her car loan that ends in less than six years. Thus, for a significant portion of the repayment period (twelve of the remaining eighteen years left on Ms. Tinsley's repayment plan), her expenses will decrease dramatically.

Ms. Tinsley argues that she will soon be reaching retirement age and that when her children become independent, she will receive less rental assistance. But this argument ignores the fact that a reduction of income will have a corresponding reduction in expenses. It also ignores the fact that if her income goes down, she will likely remain eligible for a $0 plan since she currently qualifies for one now. Upon retirement, there will no longer be any expenses associated with work and once the children are independent, there will no longer be any costs associated with them. Retirement and rental assistance concerns alone are not enough to convince the court that additional circumstances exist indicating that Ms. Tinsley's current state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

### 3. Ms. Tinsley failed to produce any evidence that showed how her student loans have created a "stigma" in her life and how that stigma will impact her for a significant portion of the repayment period of the student loans.

When pressed, Ms. Tinsley explained that the dollar amount of a zero-dollar-per-month repayment plan was not her problem. Rather, she insisted that the driving force behind seeking a hardship discharge of her student loan was because of the "stigma" the student loans presented in her life. In *In re Greene*, No. 4:13CV79, 2013 WL 5503086, at *5 (E.D. Va. Oct. 2, 2013), *aff'd*, 573 F. App'x 300 (4th Cir. 2014), the debtor argued that she could not obtain steady employment or find affordable housing due to the negative impact the loan had on her credit score. The district court stated that it did not dispute that poor credit scores could preclude someone from obtaining housing or hurt their employment prospects, but the debtor failed to introduce any evidence that showed she had actually been impacted in such a way. *Id.* The court further stated that even if the debtor had shown that her student loan debt would hurt her employment and housing prospects, it would be irrelevant to whether her payments under the loan repayment plan caused her undue hardship. *Id. But see In re Jolie*, No. 12-61188-7, 2014 WL 929703, at *9 (Bankr. D. Mont. Mar. 10, 2014) (finding that the debtor's credit score prevented her from being able to apply for higher paying jobs because employers check income and, ultimately, that the debtor met her burden of showing that her income could not reasonably be expected to change).[15]

Here, Ms. Tinsley claims that the stigma from the student loan hinders her from relocating to a safe neighborhood; prevents her from assisting her children with the Parent PLUS loan when they are attending school; and harms her ability to obtain better employment because employers deny certain positions to employees if they "owe certain loans." However, Ms. Tinsley offered absolutely no evidence to support any of her arguments and in fact, boldly refused to present evidence when asked to do so. So even if "stigma" is an appropriate consideration under the second prong of the *Brunner* test, the court cannot consider it because Ms. Tinsley failed to put forth any evidence to support her argument that her student loan debt has created a stigma that hinders her ability to move, receive promotions, or help finance her children's education. Ms. Tinsley did not provide credit scores or any statements from professionals explaining how credit scores are used in the context she argued above.[16] Certainly, Ms. Tinsley did not succeed in convincing the court how that stigma will impact her for a significant portion of the repayment period of the student loans.

Ms. Tinsley has eighteen years remaining in the PAYE program and then her loan will be forgiven. Ms. Tinsley is currently eligible for a zero-dollar-per-month plan, which is determined based upon her income and number of dependents. Ms. Tinsley testified that due to her medical condition she is unable to take on more work than she is currently doing, and nothing in the record indicated her income will increase more than inconsequentially. Thus, there is no reason for the court to believe that her monthly student loan requirements will increase until she no longer has

---

[15] Ms. Tinsley's financial circumstance is different from the debtor in *Jolie*, in that the record reflects that Ms. Tinsley's financial position will improve dramatically in about six years.

[16] To the contrary, the evidence shows that the student loans do not prevent Ms. Tinsley from obtaining credit as she was able to obtain an expensive car loan (a little less than the amount of the total student loan debt) for a brand-new vehicle while these loans were outstanding.

dependents. Additionally, nothing in the record indicates that Ms. Tinsley will lose her job at Comcast due to her iron deficiency, so she will be able to maintain her current lifestyle. Furthermore, in approximately six years Ms. Tinsley will no longer have any dependents or her $600 per month car payment. Thus, though Ms. Tinsley *currently* is unable to fulfill her financial commitments, nothing in the record shows the court that there exists "certainty of hopelessness" that Ms. Tinsley will be unable to repay her loans for a significant portion of the repayment period. According, the second prong of the *Brunner* test cannot be satisfied, and the student loan is not entitled to be discharged as an undue hardship under 11 U.S.C. §523(a)(8).

### C. Prong 3: Good Faith

As the court has found that Ms. Tinsley has failed to satisfy the second prong of the *Brunner* test, it need not consider the final prong. *See Faish*, 72 F.3d at 306 and *Davis*, 526 B.R. at 141.

### CONCLUSION

Because Ms. Tinsley failed to meet the second prong of the *Brunner* test, the student loan owed to DOE cannot be discharged as an undue hardship pursuant to 11 U.S.C. §523(a)(8).

The court notes that should her circumstances change in a way that her loan obligations become an "undue hardship," Ms. Tinsley may reopen her bankruptcy case to pursue an undue hardship discharge. *See In re Werner*, No. CIV. 08-00819 (JBS), 2008 WL 5111271, at *3, n.4 (D.N.J. Nov. 21, 2008); *In re Sobh*, 61 B.R. 576, 579 (E.D. Mich. 1986); *see also In re Walker*, 427 B.R. 471, 480 (B.A.P. 8th Cir. 2010), *aff'd*, 650 F.3d 1227 (8th Cir. 2011). However, the court cautions Ms. Tinsley that her circumstances must change from her current financial condition. Her failure to produce evidence during trial to support her current claim based upon her current financial condition, prevents and/or estops her from seeking a hardship discharge on the same set of facts and circumstances.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: December 26, 2018